In The

# United States Court of Appeals

for the Sixth Circuit

SENATOR JONATHAN LINDSEY, SENATOR JAMES RUNESTAD, REPRESENTATIVE JAMES
DESANA, REPRESENTATIVE RACHELLE SMIT, REPRESENTATIVE STEVE CARRA,
REPRESENTATIVE JOSEPH FOX, REPRESENTATIVE MATT MADDOCK,
REPRESENTATIVE ANGELA RIGAS, REPRESENTATIVE JOSH SCHRIVER,
REPRESENTATIVE NEIL FRISKE, AND REPRESENTATIVE BRAD PAQUETTE,
*Plaintiffs–Appellants,*

v.

GRETCHEN WHITMER, IN HER OFFICIAL CAPACITY AS GOVERNOR OF MICHIGAN, OR
HER SUCCESSOR; JOCELYN BENSON, IN HER OFFICIAL CAPACITY AS MICHIGAN
SECRETARY OF STATE, OR HER SUCCESSOR, AND JONATHAN BRATER, IN HIS OFFICIAL
CAPACITY AS DIRECTOR OF ELECTIONS, OR HIS SUCCESSOR,
*Defendants–Appellees.*

**Appeal from the United States District Court, Western District of Michigan,
Case No. 1:23-cv-01025, Hon. Jane Beckering**

**Reply Brief of Plaintiffs-Appellants**

Erick G. Kaardal (MN No. 229647)
Elizabeth A. Nielsen (MI No. P87437)
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, Minnesota 55402
Telephone: 612 341-1074
Email: kaardal@mklaw.com
Email: nielsen@mklaw.com

*Counsel for Appellants*

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... i

TABLE OF CITATIONS ........................................................................................ ii

ARGUMENT ........................................................................................................ 1

    I.  The Legislator-Appellants continue to suffer individual, concrete injuries-in-fact, and controlling Supreme Court precedent lays the foundation for their standing. ..................................................................................................... 2

        A.  The Legislator-Appellants pathway to standing comes from the violation of their individual rights via a complete *Coleman* Claim. ............................................. 2

        B.  Incomplete Coleman claim cases are distinguishable from the facts presented by Legislator-Appellants ........................................................................... 7

    II.  Legislator-Appellants' claims are not foreclosed by the *Arizona State Legislature* opinion. ............................................................................................. 12

    III. The Legislator-Appellants' challenge both to the 2018 and 2022 amendments and the process that implemented them, is redressable. .......................................... 14

CONCLUSION .................................................................................................... 16

CERTIFICATE OF COMPLIANCE ......................................................................... 17

USE OF AI TECHNOLOGY CERTIFICATION ......................................................... 18

CERTIFICATE OF SERVICE ................................................................................. 19

ADDENDUM ...................................................................................................... 20

# TABLE OF CITATIONS

Page(s)

## Cases

*Arizona State Legislature v. Arizona Independent Redistricting Commission*,
   576 U.S. 787 (2015) ..................................................................... 9, 12, 13, 14

*Blumenthal v. Trump*,
   949 F.3d 14 (D.C. Cir. 2020) ....................................................................... 11

*Coleman v. Miller*,
   307 U.S. 433 (1939 ........................................................................... 2, 3, 8, 9

*Moore v. Harper*,
   600 U.S. 1 (2023) ............................................................................. 4, 12, 13

*Raines v. Byrd*, 521 U.S. 811 (1997) ........................................................... passim

*Silver v. Pataki*,
   755 N.E.2d 842 (2001) ................................................................................ 5

*State by & through Tennessee Gen. Assembly v. United States Dep't of State*,
   931 F.3d 4991 (6th Cir. 2019 .............................................................. 2, 10, 11

*Steel Co. v. Citizens for a Better Environment*,
   523 U.S. 83 (2008) .................................................................................... 15

*Yaw v. Delaware River Basin Comm'n*,
   49 F.4th 302 (3d Cir. 2022) ..................................................................... 4, 12

*Virginia House of Delegates v. Bethune-Hill*,
   587 U.S. 658 (2019) ..................................................................................... 9

*Warth v. Seldin*,
   422 U.S. 490 (1975) ..................................................................................... 1

**Statutes**

28 U.S.C. § 2201 ........................................................................................... 15

Michigan Constitution, article XII, § 2 ........................................................ 15

U.S. Const. art. I ....................................................................................... 2, 4

U.S. Const., art. II, § 1, cl. 2 ......................................................................... 4

**Rules**

Fed. R. Civ. P. Rule 65 (injunctions) ........................................................... 15

**Other Authorities**

Elizabeth Earle Beske, *Litigating the Separation of Powers,*
   *73* Ala. L. Rev. 8235 (2022 ..................................................................... 3

William D. Gohl, *Standing Up for Legislators: Reevaluating Legislator Standing in the Wake of*
   *Kerr v. Hickenlooper,* 110 Nw. U. L. Rev. 1269 (2016) .................................... 6

# ARGUMENT

Plaintiff-Legislator-Appellants, (referred to as "Legislator-Appellants" for clarity as opposed to other individual legislators, or the body of the legislature as a whole) maintain that the Elections Clause, if it means anything, confers to them, as members of the state legislature, the opportunity to vote on the time, place, and manner of federal elections.[1] That opportunity to vote on the time, place, and manner of federal elections has been abrogated by the Defendant-Appellees Governor Gretchen Whitmer, Secretary of State Jocelyn Benson, and Director of Elections Jonathan Brater (collectively the "Governor"). The Governor is responsible for allowing use of a ballot-initiative and referendum process to alter the time, place, and manner of federal elections in the state by amending the Michigan constitution in 2018, and again in 2022, and in the future, without input from the legislature. This practice also continues to injure individual Legislator-Appellants who would propose contravening legislation but-for the ongoing barrier imposed by the invalidly-enacted amendments, which could be redressed by declaratory and injunctive relief.

---

[1] The relevant context of the merits of the case, including the right asserted is discussed in further detail in Legislator-Appellants' principal brief, as of course, standing "often turns on the nature and source of the claim asserted." *Warth v. Seldin*, 422 U.S. 490, 500 (1975).

## I. The Legislator-Appellants continue to suffer individual, concrete injuries-in-fact, and controlling Supreme Court precedent lays the foundation for their standing.

### A. The Legislator-Appellants pathway to standing comes from the violation of their individual rights via a complete *Coleman* Claim.

The individual Legislator-Appellants present a unique set of circumstances in which they maintain they have standing for violation of their federal civil rights and duties through the Elections Clause. U.S. Const. art. I § 4. The Governor, however, has asserted that there are only two circumstances in which legislators can have standing, that is, when legislators "(1) have been authorized by the legislature to assert the claim on its behalf, or (2) constitute a controlling faction of the legislature" Def. Br. at 11. As explained below, the Governor's rendering of existing caselaw is more narrow than examination of that law requires.

The path Legislator-Appellants set upon to reach the courthouse doors is narrow, but paved, as they allege a *Coleman*-type injury to their constitutional rights and duties as individual legislators to regulate the time, place, and manner of federal elections. *Coleman v. Miller*, 307 U.S. 433 (1939). As this Court has said, "*Coleman* is not *precisely* an 'institutional injury' case—rather, it is a claim by some legislators that state procedural irregularities undermined their duty under the U.S. Constitution and nullified their votes." *State by & through Tennessee Gen. Assembly v. United States Dep't of State*, 931 F.3d 499, 511 (6th Cir. 2019) (citing *Coleman*, 307 U.S. at 438) (emphasis in original).

Fundamentally, the Legislator-Appellants allege a *Coleman*-based claim (derived from the 1939 U.S. Supreme Court case *Coleman v. Miller*), which can be broken-down into three elements: (1) the defendant is a proper coordinate branch target, (2) usurpation of a Constitutional legislative prerogative, and (3) either a sufficient number of plaintiffs who were denied participation in a Constitutional process, or plaintiffs whose participation in the processes granted to them would be sufficient, but-for the injury alleged. *Coleman v. Miller*, 307 U.S. 433 (1939); *see* Elizabeth Earle Beske, *Litigating the Separation of Powers*, 73 Ala. L. Rev. 823, 874–75 (2022) (distilling a three-part framework for *Coleman* claims in light of *Raines v. Byrd* and other subsequent cases).

To start with (1), a proper coordinate branch target, Legislator-Appellants have selected appropriate *Coleman* claim defendants. The Defendants in this matter are all part of the coordinate state executive branch. Unlike the plaintiffs in *Raines v. Byrd*, none of the injuries the Legislator-Appellants brought to the court were self-inflicted. 521 U.S. 811 (1997). In *Raines,* Congress had enacted the law congress member plaintiffs complained about. *See infra* I. B. To the contrary, in this case, the 2018 and 2022 constitutional amendments were not even presented to the state legislature. These facts distinguish *Raines* from the present case.

Next, in their Coleman claim, Legislator-Appellants allege (2) usurpation of a constitutional legislative prerogative, primarily that conferred to them through the Elections Clause. Legislator-Appellants are not challenging "any" law, or a vague

dilution of power, but specific executive usurpation of the legislative authority and duty conferred to them by the Elections and Electors Clauses.

To illustrate the importance of a U.S. Constitutional violation, we turn to a Third Circuit opinion that the Governor highlighted in the defendants' response, *Yaw v. Delaware River Basin Comm'n*, 49 F.4th 302 (3d Cir. 2022); Def. Br. at 22. In *Yaw*, two individual legislators did not have standing, in-part because the *Yaw* plaintiff-legislators alleged only a general usurpation of what they believed should have been a legislative decision on environmental issues, and not usurpation of a specific U.S.-Constitutionally-conferred authority and duty. *Id.* at 314.

The Elections Clause assigns the duty of determining the time, place, and manner of elections to state legislators. (U.S. Const., Art. I, Sec. 4, Cl.1). The Electors Clause grants state legislators plenary federal authority to enact statutes governing presidential elections. (U.S. Const., art. II, § 1, cl. 2). Pursuant to the U.S. Constitution, it is the state legislators that must draft, pass and enact a complete code of regulations regulating federal elections. (*See Moore v. Harper*, 600 U.S. 1 (2023)). Legislator-Appellants were, and are being deprived of that opportunity and duty because of the Governor's actions.

Finally, (3), Legislator-Appellants were all individually foreclosed from taking part in the normal legislative processes in which their votes would have contributed to the legislative actions regarding items impacting the time, place, and manner of federal elections that would contravene the 2018 and 2022 amendments. However, to say that

the minimum number of plaintiffs required for Article III standing *must* be more than one individual state legislator misreads both *Raines* and *Coleman*.

The Court of Appeals of New York's decision in *Silver v. Pataki*, which reasoned consistent with *Raines* and *Coleman*, found standing for a single legislator bringing a *Coleman* claim, and explained how *Raines* does not require a different result for individual legislator standing when no legislative political battle had been lost. *Silver v. Pataki*, 755 N.E.2d 842, 848 (2001). This is because the nullification of the individual legislator's personal vote "continues to exist whether or not other legislators who have suffered the same injury decide to join in the suit." *Id.* at 849. The Court of Appeals of New York further explained in a footnote why it rejected the dissenting idea that a controlling bloc of legislators would be required for standing, and indeed, how a less than a controlling bloc supports characterizing the claimed injury as personal to the one(s) who bring the claim to the court:

> In the dissent's view, only "a sufficient voting bloc" of legislators who voted for the bills in question could act as plaintiffs in the absence of a Resolution of the Assembly authorizing a lawsuit. Under that analysis, it would seem that all who voted for the bills in question would need to join. Thus, a suit could be blocked by one legislator who chose, for whatever reason, not to join in the litigation. Such a result would place too high a bar on judicial resolution of constitutional claims. However, if a "sufficient voting bloc" is less than all legislators who voted for the bill, the injury cannot be characterized as institutional and must be viewed as personal to those who assert the claim.

*Id.* at 849 n.7 (internal citation omitted).

The New York Court of Appeals *Silver* decision, while merely persuasive for this Court, is correct. In this case, requiring a majority of state legislators to join the suit as plaintiffs creates "too high a bar" on federal court resolution of constitutional claims. Thus, under Article III, a "sufficient voting bloc" of state legislators is not required to bring a properly-pled Elections Clause legislative usurpation claim in federal court.

Instead, the Article III requirement is that at least <u>one</u> state legislator must bring the claim against whichever coordinate branch officials have caused the injury. *See* William D. Gohl, *Standing Up for Legislators: Reevaluating Legislator Standing in the Wake of Kerr v. Hickenlooper,* 110 Nw. U. L. Rev. 1269, 1296–98 (2016) ("[L]imiting legislators' cognizable injuries in fact to nullifications of recorded votes misreads *Raines* and misunderstands the legislative function…If a legislator can identify an enumerated institutional power that has been unlawfully curtailed, then the legislator satisfies Article III's injury-in-fact requirement.") That Article III requirement has been met in this case too because eleven injured Legislator-Appellants have filed this lawsuit.[2]

---

[2] Regardless of a single plaintiff losing his primary election, and therefore, leaving office at the end of 2024, the point regarding the minimal number of legislators alleging individual injury stands.

## B. Incomplete Coleman claim cases are distinguishable from the facts presented by Legislator-Appellants.

Legislator-Appellants are not excluded by *Raines*, unlike other cases which failed to bring full *Coleman* claims.

In *Raines v. Byrd,* 521 U.S. 811 (1997), six disgruntled members of Congress who had voted against the Line Item Veto Act, which was enacted and signed into law, filed suit seeking a declaratory judgment that the Act was unconstitutional. *Raines,* 521 U.S. at 814–17. In denying standing, the Supreme Court noted that the plaintiffs' asserted injury to their legislative power was, in a real sense, inflicted by Congress upon *itself.* Indeed, the plaintiffs had tried and failed to persuade Congress not to pass the Act. When Congress considered the Line Item Veto Act, the plaintiffs' votes "were given full effect. [Plaintiffs] simply lost that vote." *Id.* at 824.

The *Raines* Court expressed doubts that individual legislators who had lost a legislative battle could ever establish standing to assert a resulting injury on behalf of either their chamber or Congress itself. In such a case, the Court stated, the plaintiffs' quarrel was with their colleagues in Congress and not with the executive branch. *Id.* at 830, n.11. The Court expressed a deep reluctance to let members who had lost a battle in the legislative process seek judicial intervention by invoking an injury to Congress as a whole. Further, those in Congress who had wanted to, and successfully passed the Line Item Veto Act continued to think differently than the *Raines* plaintiffs. In fact, the Senate, together with the House leadership filed an amicus brief urging the

Line-Item Veto Act be upheld. *See Id.* at 818, n.2. The *Raines* plaintiffs' allegations were, the Court held, insufficient to establish a judicially cognizable vote nullification injury of the type at issue in *Coleman*. *Id.* at 824.

The *Raines* court declined to overturn *Coleman*, and instead suggested that to establish legislative standing on their own behalf, individual legislators may show vote nullification of the sort at issue in *Coleman*: that a specific legislative vote was "completely nullified" despite a legislator-plaintiff having cast a vote that was "sufficient to defeat (or enact)" the act. *Id.* at 823.

In this case, Legislator-Appellants' "quarrel" is not with their colleagues, but with the state executive branch. Their injury is not due to a battle in the legislative process, but rather, their Constitutional ability and duty to participate in the legislative process by drafting, proposing, and advocating for legislation that in any way that would contravene the 2018 and 2022 amendments is entirely foreclosed. Unlike *Raines*, the Legislator-Appellants have not, "simply lost that vote" and then sought to have the law invalidated. The Legislator-Appellants alleged injuries come from not being able to make individual contributions in the legislature regarding the time, place, and manner of elections.

Just as in *Coleman*, Legislator-Appellants' votes (and other individual legislator actions) have been overridden and held for naught through executive actions that purport to alter the time, place, and manner of elections. Just as in *Coleman*, the legislators' votes have been "stripped of their validity," and the Legislator-Appellants'

votes have been "denied [their] full validity in relation to the votes of their colleagues." *Id.* at 824 n.7. And, just as in *Coleman,* Petitioners are not alleging a vague dilution of power, but seek specific recovery based upon rights and privileges granted to them through the U.S. Constitution. *Coleman*, 307 U.S. at 438. *Raines* only contemplated the standing of members of Congress who lost a legislative vote to Congressional colleagues. *Raines* does not foreclose standing of state legislators whose possible proposed legislation, and votes were removed from the legislature. Moreover, *Raines* is silent on the preemptive effect of an executive action that properly belongs to the legislature.

Other cases cited by the Governor, in which legislator standing was not available, are unlike the present case and failed at least in-part because they did not fully allege *Coleman* claims. First, as explained in Legislator-Appellants' principal brief, the Supreme Court in *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 576 U.S. 787 (2015) held that standing existed for the Arizona State legislature as a whole. Individual state legislator standing was not addressed. And, the Supreme Court in *Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658, 668 (2019) held no standing in circumstances where the Virginia house continued alone without the state senate, but never addressed individual state legislator standing because the claimed injuries were institutional. *See also id.*at 671 ("And if harms centered on costlier or more difficult election campaigns are cognizable—a question that … we

need not decide today—those harms would be suffered by individual legislators or candidates, not by the House as a body."); Leg.-App. Br. at 31.

In this case, the Legislator-Appellants have not asserted in their complaint that the *legislature* "has suffered…disruption of the legislative process, a usurpation of *its* authority, or nullification of anything *it* has done…." *State by and through Tennessee Gen. Assembly v. U.S. Dept. of State*, 931 F.3d 499, 514 (6th Cir. 2019) (emphasis added). The Legislator make no claim of injury to the body-politic—the state legislature. The injury the Legislators claim is their own. The Legislator-Appellants' individual legislator standing is based on injuries which are personal and particularized. The Legislators-Appellants' injuries are not injuries to the state legislative branch as a whole.

Examining *State by and through Tennessee Gen. Assembly v. U.S. Dept. of State* more closely, reveals further differences between that case, *Coleman*, and Legislator-Appellants' claims. While the Tennessee General Assembly had probably selected an appropriate coordinate-branch target defendant, it did not bring a claim of violation of the U.S. Constitution for purposes of a complete *Coleman* claim. In *Tennessee Gen. Assembly*, the General Assembly as a whole body claimed the U.S. Department of State had completely nullified its votes to appropriate state funds by requiring the state to give Medicaid to certain refugees. *Tennessee Gen. Assembly*, 931 F.3d at 513. However, there was no allegation that the General Assembly could not pass other appropriation bills, and the state of Tennessee voluntarily participated in the federal

10

Medicaid program in order to receive federal funding. *Id.* at 514. This Court decided that the General Assembly alleged an abstract "loss of political power," rather than "disruption of the legislative process, a usurpation of its authority, or nullification of anything it has done." *Id.* (citing *Raines*, 521 U.S. at 821, and referencing *Coleman* and *Arizona State Legislature*).

The 2020 D.C. Circuit opinion in *Blumenthal v. Trump*, 949 F.3d 14, 20 (D.C. Cir. 2020) likewise is distinct from *Coleman* and this case. *See* Def. Br. at 25. In *Blumenthal*, the D.C. Circuit mentioned *Raines*'s supposed limiting of *Coleman* to assert that *Coleman* only survives "for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." *Id.* at n.3, however, as-explained above through the reasoning of *Silver*, the minimum number of plaintiffs required to bring an actual *Coleman* claim is actually one. The government's error is suggesting more is required for standing

Additionally, like *Raines*, the plaintiffs in Blumenthal were members of Congress, not state legislators, which implicates only federal separation-of-powers issues, rather than the particular role of the state legislature or individual legislators under the Elections Clause. Further, *Blumenthal* did not involve allegations of Elections-Clause violations.

The Governor also cites the relatively recent Third Circuit decision *Yaw v. Delaware River Basin Commission*, 49 F.4th 302, 310 (3d Cir. 2022) as an example of how an appellate court treats individual legislator standing in light of *Raines*, *Arizona*, and *Va. House of Delegates*; however, *Yaw* is yet another example of an incomplete *Coleman* claim. *See* Def. Br. at 25. The *Yaw* facts are easily distinguished from the present case, and more importantly, *Coleman*, which the Third Circuit did address. In *Yaw*, there were two senators among the plaintiffs who challenged the Delaware River Basin Commission's fracking ban. The senators framed their involvement in that case as a *Coleman* claim, however, the *Yaw* senator plaintiffs were missing a critical piece to their *Coleman* claim as they did not allege usurpation of a specific U.S. constitutional legislative prerogative, but only a more vague general state "constitutionally enshrined fiduciary obligation" related to conserving natural resources from the state's Environmental Rights Amendment. *Id.* at 320. The text of the ERA amendment at issue in *Yaw* did not necessarily provide that the legislature specifically vested the *Yaw* plaintiffs with the trust of Pennsylvania's natural resources. *Id.* at 320. Therefore, there was no "usurpation of a Constitutional legislative prerogative" alleged for the purpose of a complete *Coleman* claim.

## II. Legislator-Appellants' claims are not foreclosed by the *Arizona State Legislature* decision.

The majority opinion in *Moore v. Harper* constrains the opining in *Arizona State Legislature* on the meaning of "legislature" under the Elections Clause. The *Moore*

majority clarified that the Court in *Arizona State Legislature*, in view of the Elections Clause, mainly allowed the creation of a new legislative authority *entity* body, a redistricting commission, that itself could regulate the manner of elections pertaining to redistricting. 600 U.S. 1, 26 (2023):

> The Court ruled, in short, that although the Elections Clause expressly refers to the 'Legislature,' it does not preclude a State from vesting congressional redistricting authority in a body other than the elected group of officials who ordinarily exercise lawmaking power.

The Supreme Court in *Moore* emphasized that the Elections Clause refers to a body or entity: "The legislature acts both as a lawmaking body created and bound by its state constitution, and as the entity assigned particular authority by the Federal Constitution. Both constitutions restrain the legislature's exercise of power." *Id.* at 27. This apparent constraint corresponds with the Chief Justice Roberts's dissenting opinion in the *Arizona State Legislature* case, in which he stated in context of the Elections clause that:

> The Constitution includes seventeen provisions referring to a State's 'Legislature.' Every one of those references is consistent with the understanding of a legislature as a representative body. More importantly, many of them are only consistent with an institutional legislature—and flatly incompatible with the majority's reading of "the Legislature" to refer to the people as a whole.

576 U.S. at 829 (Roberts, C.J., dissenting) (internal citation omitted).

In addition to the constraint of *Moore v. Harper* on *Arizona State Legislature*, the facts of Arizona are so distinct from the present case that the factual distinctions

alone do not allow *Arizona State Legislature* case to foreclose Legislator-Appellants' claims. While the Arizona proposition 106 that created the Independent Redistricting Commission was part of the case brought by the Arizona State Legislature as a whole, the proposition 106, that is the constitutional amendment, did not itself regulate the time, place, and manner of elections; instead, proposition 106 created a legislative body to do so. *Arizona State Legislature*, 576 U.S. at 793. The 2018 and 2022 amendments in Michigan, did not merely create an additional body for a limited purpose, but rather, explicitly and extensively enacted multiple constitutional provisions explicitly regulating the time, place, and manner of elections in the state— without any legislative body being involved. *See* Complaint Exhibits A-B, R. 4, Page ID # 24-30 (text of the 2018 and 2022 amendments). Therefore, *Arizona State Legislature* is legally distinguishable and presents no binding precedent on the questions presented by this case.

### III. The Legislator-Appellants' challenge both to the 2018 and 2022 amendments and the process that implemented them, is redressable.

The Legislator-Appellants claims of legal violations of their rights as legislators are continuing and redressable by the judiciary. Contrary to the Governor's contention, *e.g.*, Def. Br. at 4, the Legislators' claims are not "hopelessly" speculative as the Legislators continue to face a current barrier to legislation they would propose but-for the amendments.

Fundamentally, redressability is "a likelihood that the requested relief will redress the alleged injury." *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 102–03 (2008). There should be no question about redressability. The Legislators seek prospective equitable relief that the 2018 constitutional amendment, the 2022 constitutional amendment and any future constitutional amendments adopted without state legislative approval which regulate the times, places and manner of federal elections violate the Elections Clause through the Supremacy Clause. This Court has the legal authority to issue an order declaring the 2018 and 2022 state constitutional amendments as violative of the Elections Clause and to enjoin any process adopting a state constitutional amendment that likewise would regulate the times, places, and manner of federal elections without state legislative approval. 28 U.S.C. § 2201, et seq. (declaratory judgment act); Fed. R. Civ. P. Rule 65 (injunctions).

The Governor also argues that the claim against future proposed constitutional amendments is speculative because there is not at this moment a ballot-initiative and referendum proposal to further alter the time, place, and manner of federal elections through another state constitutional amendment. But, again, while there is an imminence requirement for federal jurisdiction, no impending proposal is required under the facts presented here. The plaintiff Legislator claims are targeted against the process of adopting these constitutional amendments without state legislative approval, per Michigan Constitution, article XII, § 2, specifically as it relates to regulating federal elections. The Governor continues to defend that process while

acknowledging it's a current barrier to the Legislators' law-making regulating federal elections. *E.g.*, Defs. Br. at 31. Allowing use of a process that excludes the legislators from altering the time, place, and manner of elections, and thereby creating a current, ongoing barrier is hardly speculative.

## CONCLUSION

For the foregoing reasons, the district court decision should be reversed.

Respectfully submitted,

/s/Erick G. Kaardal
Erick G. Kaardal (MN No. 229647)
Elizabeth A. Nielsen (MI No. P87437)
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, Minnesota 55402
Telephone: 612 341-1074
Email: kaardal@mklaw.com
Email: nielsen@mklaw.com

*Counsel of Record for Appellants*

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 3,757 words, excluding the parts of the brief exempted by Fed. R. App. P. 32 (a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in size 14 Garamond font.


Dated: September 18, 2024                    /s/ Erick G. Kaardal
                                             Erick G. Kaardal, #229647
                                             Mohrman, Kaardal & Erickson, P.A.
                                             150 South Fifth Street, Suite 3100
                                             Minneapolis, Minnesota 55402
                                             Telephone: 612-341-1074
                                             Email: kaardal@mklaw.com
                                             *Attorneys for the Appellants*

# USE OF AI TECHNOLOGY CERTIFICATION

Counsel attests to the best of counsel's ability that appropriate steps to verify whether AI technology systems have been used in preparation of this submission, and if used, appropriate steps were taken to verify the truthfulness and accuracy of facts and citations of that content before submission to this Court. This submission did rely upon the ordinary or customary research tools and other available research sources such as, but not limited to, Westlaw or Lexis.

Dated: September 18, 2024

/s/Erick G. Kaardal
Erick G. Kaardal, (MN No.229647
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, Minnesota 55402
Telephone: 612-341-1074
Email: kaardal@mklaw.com
*Attorneys for the Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 18, 2024 the foregoing document was served

on all parties or their counsel of record through the CM/ECF.


Dated: September 18, 2024                    /s/Erick G. Kaardal
                                                Erick G. Kaardal, #229647
                                                Mohrman, Kaardal & Erickson, P.A.
   150 South Fifth Street, Suite 3100
   Minneapolis, Minnesota 55402
   Telephone: 612-341-1074
   Email: kaardal@mklaw.com
   *Attorneys for the Appellants*

# ADDENDUM

*Appellants' 6 Cir. R. 30(g) Designation of Relevant Court Documents Cited in the Appellants Principal and Reply Briefs*

| Record Citation | Date Filed |
|---|---|
| Complaint, R. 1, Page ID # 1-16 | 09/28/23 |
| Complaint Exhibits A-B, R. 4, Page ID # 24-30 | 09/28/23 |
| Defendant's Motion to Dismiss, R. 15, Page ID # 173-175 | 01/08/24 |
| Defendant's Brief in Support of Motion to Dismiss, R. 16, Page ID # 176-205 | 01/08/24 |
| Plaintiff's Brief in Opposition to Motion to Dismiss, R. 19, Page ID 215-258 | 02/05/24 |
| Order and Opinion, R. 25, Page ID # 300-312 | 04/10/24 |
| Judgment, R. 26, Page ID # 313 | 04/10/24 |
| Notice of Appeal, R. 27, Page ID 314-315 | 05/03/24 |